**BEFORE THE UNITED STATES JUDICIAL PANEL ON**

**MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | MDL DOCKET NO. 2985 |
| IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION | MDL DOCKET NO. 3001 |

**MDL PLAINTIFFS' OPPOSITION TO APPLE INC.'S AND GOOGLE LLC'S MOTION
TO TRANSFER FOR COORDINATION PURSUANT TO 28 U.S.C. § 1407**

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND .......................................................................................................... 2

  A.   JPML Proceedings. ................................................................................................ 2

  B.   Gameplay Mechanics and Payment Processing. ................................................... 3

III.  ARGUMENT ............................................................................................................... 5

  A.   The Platforms Significantly Overstate the Factual Overlap Between the Social Casino Apps and the Sweepstakes Casino Apps. ................................................... 5

    1.   The Gameplay Differs Between Social Casino Apps and Sweepstakes Casino Apps. .. 6

    2.   The Platforms' Relationship with Sweepstakes Casinos is Fundamentally Different from their Relationship with the Social Casinos that are Part of this MDL. ......................... 8

  B.   Transfer Would Not Promote the Just and Efficient Resolution of the Actions. ............. 12

    1.   Different Discovery Is Needed in Each Case and Informal Coordination can Mitigate the Burden of any Overlap. ................................................... 13

    2.   There is Little Risk of Inconsistent Pretrial Rulings. .................................................... 13

    3.   Transfer Would Merely Shift the Inconvenience from the Defendants to the *Bargo* Plaintiffs. ................................................................................. 15

    4.   Transfer Would Procedurally Complicate, Rather than Streamline, All Cases. ........... 16

IV.   CONCLUSION........................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Coffee v. Google LLC*,
No. 5:20-cv-03901-BLF (N.D. Cal. Oct. 13, 2020)............................................................ 5

*CPG Holdings, LLC v. Craig*,
No. CV 07-4072 (WHW), 2008 WL 11510684 (D.N.J. June 2, 2008) ............................ 15

*Epic Games, Inc. v. Apple Inc.*,
No. 4:20-CV-05640-YGR, 2025 WL 1260190 (N.D. Cal. Apr. 30, 2025) ..................... 11

*Gelboim v. Bank of Am. Corp*.,
574 U.S. 405 (2015)......................................................................................................... 5

*In re Am. Gen. Life & Accident Ins. Co. Indus. Life Ins. Litig.*,
175 F. Supp. 2d 1380 (J.P.M.L. 2001)........................................................................... 15

*In re Cable Tie Pat. Litig.*,
487 F. Supp. 1351, 1354 (J.P.M.L. 1980)........................................................................ 2

*In re Consol. Parlodel Litig.*,
182 F.R.D. 441 (D.N.J. 1998).......................................................................................... 12

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
24 F. Supp. 3d 1361 (J.P.M.L. 2014)............................................................................... 7

*In re Lupron Mktg. & Sales Pracs. Litig.*,
180 F. Supp. 2d 1376 (J.P.M.L. 2001)........................................................................... 15

*In re Plumbing Fixtures*,
308 F. Supp. 242 (J.P.M.L. 1970)................................................................................... 15

*In re Seroquel Prods. Liab. Litig.*,
447 F. Supp. 2d 1376 (J.P.M.L. 2006)........................................................................ 5, 6

*In re Vioxx Prods. Liab. Litig.*,
360 F. Supp. 2d 1352 (J.P.M.L. 2005)............................................................................. 6

*In Re: Apple Inc. App Store Simulated Casino-Style*,
No. 5:21-md-02985-EJD (N.D. Cal. Jun. 4, 2024) .......................................................... 5

*In re: Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
24 F. Supp. 3d 1366 (J.P.M.L. 2014)............................................................................. 14

*In re: Nebivolol (%2C040) Pat. Litig.*,
   867 F. Supp. 2d 1354 (J.P.M.L. 2012).............................................................. 14

*Schultz v. Harry S. Truman Scholarship Found.*,
   No. 20-CV-04058-MMC, 2022 WL 3691663 (N.D. Cal. Aug. 25, 2022) ..................... 15

*Sequeira v. United States Dep't of Homeland Sec.*,
   347 F.R.D. 510 (N.D. Cal. 2024).................................................................... 13

*Taylor v. Apple Inc.*,
   No. 3:20-cv-03906-RS (N.D. Cal. Oct. 29, 2020) ............................................. 5

## I.     INTRODUCTION

Four years ago, this Panel created the above-captioned MDL actions to consolidate claims against Apple and Google (the "Platforms") arising from their conduct in offering and brokering in-app purchases of virtual coins in Social Casino Apps. As alleged in the Master Complaints against Apple and Google, in order to purchase virtual coins in these Social Casino Apps, players are *required* to use the Platform's in-app purchasing system, the Platform takes a 30% cut of each and every coin transaction, and players can never cash out their virtual coins. As a result, the Platforms have made billions of dollars from these Social Casino Apps while players have lost.

Now, the Platforms want to transfer in a new case involving a different set of mobile games ("Sweepstakes Casino Apps") in which both the Platforms' role and the mechanics of gameplay are fundamentally different. First, the games: unlike the Social Casino Apps, the basic mechanics of the Sweepstakes gameplay is that players can acquire and cash out Sweeps Coins in exchange for U.S. dollars. Second, the Platforms' role: in the Sweepstakes Casino Apps, players do not buy the at-issue currency primarily through in-app purchases (if at all, the allegations on this point are perplexing) but through an off-app purchasing portal that takes a credit card, Apple Pay, Google Pay, and other payment methods. The Platforms may not make *any* commission on these off-app purchases and certainly not the universal 30% cut. (The *Bargo* Complaint's allegations about the Platforms' involvement in the purchases are broad and primarily "on information and belief.")

These core differences—both in game mechanics and in the Platforms' role—between the *Bargo* Action and these MDLs mean that *Bargo* will proceed on an entirely different theory of why this gaming constitutes illegal gambling and why the Platforms have liability. That means

1

different briefing, different discovery, different arguments at trial, and different damages calculations. The Platforms' basic argument that the *Bargo* Complaint also alleges illegal gambling in mobile apps paints with far too broad a brush.

Moreover, it would be procedurally inefficient to force the *Bargo* Action's late inclusion into the long-running MDLs. The parties in the MDLs have already litigated and received a ruling on an initial round of Rule 12(b)(6) motions related to Section 230 immunity, and have fully briefed and argued a second round of broader Rule 12(b)(6) motions. The Master Complaints in the MDL, filed in 2021 (and not substantively changed since then), do not address Sweepstakes Casino Apps or Sweeps Coins at all. Forcing *Bargo* into these MDLs would thus require either another amended master complaint, or would require *Bargo* to proceed along a separate track. In either case, transfer stands to create more inefficiencies, not fewer.

Ultimately, the Platforms have failed to meet their burden of demonstrating that transfer furthers the purposes of Section 1407. *See In re Cable Tie Pat. Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). The Panel's initial reaction to summarily deny the Platforms' bid to tag and transfer *Bargo* into the MDL was the correct one. The Platforms have provided no sound reasons to revisit and overturn that decision. The motions should be denied.

## II.    BACKGROUND

### A.    JPML Proceedings.

On March 30, 2021, the Panel ordered the transfer of several actions involving simulated casino-style games to the Northern District of California for centralized proceedings before Judge Edward J. Davila in Case No. 5:2021-md-02985-EJD (the "Apple MDL"). (Apple JPML Dkt. 40.) On June 3, 2021, the Panel transferred similar actions against Google to Judge Davila in Case No. 5:2021-md-03001 (the "Google MDL"). (Google JPML Dkt. 37.) In both transfer orders, the Panel identified four common factual questions in the consolidated and coordinated

2

cases: "(1) the nature of the game play within the same 200 or more involved apps and the function of in-app purchases; (2) the nature of [Google's / Apple's] relationship with the third-party app developers, including [Google's / Apple's] process for reviewing and publishing apps; (3) [Google's / Apple's] financial arrangements for distributing app-based revenue from the games; and (4) [Google's / Apple's] alleged promotion of the apps." (Apple JPML Dkt. 40 at 1-2; Google JPML Dkt. 37 at 2.) All of the consolidated cases involve Social Casino Apps, and none advance a theory of liability related to Sweeps Coins. In fact, the Platform MDL complaints don't mention Sweeps Coins at all.

### B.    Gameplay Mechanics and Payment Processing.

The MDL Social Casino Apps and the *Bargo* Action's Sweepstakes Casino Apps operate on fundamentally different game mechanics. In the Social Casino Apps, players purchase a type of virtual coin—often called "Gold Coins"—with real money to wager on the online slots for the chance to win more Gold Coins, which can *only* be used to continue gambling within the casino app.[1] (*See Apple* Am. Compl. ¶¶ 3-4; *Google* Am. Compl. ¶¶ 3-4.) These Gold Coins cannot be redeemed for real money or any other item of value outside of the platform. (*Id.*) This creates a closed-loop system where money flows in but never out. In contrast, the Sweepstakes Casino Apps at issue in the *Bargo* Action operate on a dual-currency model. Players purchase bundles of virtual currency that often come with two types of coins: the first is a "Gold Coin" that operates similarly to those in the Social Casino Apps, but the second (typically called "Sweeps Coins" or "Sweepstakes Coins") is explicitly redeemable in the real word—i.e., for cash, gift cards, or cryptocurrency. (*Bargo* Compl. ¶¶ 6-8, 33.)

---

[1]    This brief refers to the "virtual chips" at issue in the MDL Complaints as "Gold Coins" to distinguish them from the "Sweeps Coins" at issue in the *Bargo* action.

Payment processing also works differently. The Social Casino Apps in the MDLs exclusively utilize "in-app purchases"—a specific payment process using Apple's "In-App Purchase API" and Google's "In-App Purchases API" that are directly linked to the Apple Store and Google Play Store. *See Apple Developer Program License Agreement* § 3.3.9, *available at* https://developer.apple.com/support/terms/apple-developer-program-license-agreement/#transactions-passes [hereinafter *Apple Developer Program License Agreement* § 3.3.9]. The Platforms take a 30% commission on all such transactions, meaning they take a 30% cut of every sale of virtual coins in the Social Casino Apps. (*See Apple* Am. Compl. ¶¶ 76, 95; *Google* Am. Compl. ¶ 92.)  Virtual coin purchases on the Sweepstakes Casino Apps do *not* flow through the in-app purchasing systems. Rather, the *Bargo* plaintiffs allege that these Apps offer multiple payment methods, including credit cards, and cryptocurrency. (*Bargo* Compl. ¶¶ 16-18, 39.) These payment methods use different APIs and are subject to different rules than the In-App Purchase APIs. *Apple Developer Program License Agreement* § 3.3.9. Significantly, the commission structure for purchases made in Sweepstakes Casino Apps is very different from the universal 30% cut the Platforms receive in Social Casino Apps. The Platforms' precise commission—if any—on transactions in the Sweepstake Casino Apps varies depending on the payment method a player chooses (e.g., whether a player uses Apple Pay or Google Pay, or cryptocurrency), and has changed over time. (*See Bargo* Compl. ¶ 65 (alleging "[u]pon information and belief" that Apple and Google take "a substantial commission" for purchases through Apple Pay and Google Pay).)

## III.    ARGUMENT

### A.    The Platforms Significantly Overstate the Factual Overlap Between the Social Casino Apps and the Sweepstakes Casino Apps.

The purpose of transfer under § 1407 is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410 (2015). Even where consolidation is appropriate in some cases—like those involving the broader universe of Social Casino Apps here—the Panel "may exclude particular sets of cases raising individual questions of fact that are markedly different from those presented in the centralized cases." *See* 2 Newberg and Rubenstein on Class Actions § 6:55 (6th ed.). For that reason, the District Courts handling the MDL cases (both pre- and post-consolidation), have been hesitant to pull in cases with differing facts and legal theories. In fact, these courts have declined to relate or consolidate cases even against the app developers creating the Social Casino Apps, and have focused only on the Platforms. *See In Re: Apple Inc. App Store Simulated Casino-Style*, No. 5:21-md-02985-EJD, Dkt. 23 (N.D. Cal. Jun. 4, 2024) (finding case against app developer unrelated to Platform MDL); *Taylor v. Apple Inc.*, No. 3:20-cv-03906-RS, Dkt. 31 (N.D. Cal. Oct. 29, 2020) (declining to relate case against app developer with case against Platform); *Coffee v. Google LLC*, No. 5:20-cv-03901-BLF, Dkt. 47 (N.D. Cal. Oct. 13, 2020) (same). Though both categories of cases would involve common questions about the Social Casino Apps' illegality, they were not sufficiently similar to justify relation or consolidation.

A similar pattern is seen in pharmaceutical cases, where the Panel will often only consolidate cases involving a single drug. *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376, 1378 (J.P.M.L. 2006) (declining to include claims involving different drugs in consolidation order); *see also In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354

(J.P.M.L. 2005) (same). In those cases, key factual questions for each drug may be the same—such as "the development, testing, manufacturing and marketing of" the drug and "the defendants' knowledge concerning the drug's possible adverse effects." *In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d at 1378. But the answers to those questions and the evidence those answers are based on would inevitably vary for each drug, meaning that the efficiency goals of § 1406 would not be served.

The same is true here. The Platforms' primary argument for transfer is that the four common factual questions identified by the Panel are common to the *Bargo* action as well. (*See* Apple Mot. at 7-12; Google Mot. at 8-12.) But the answers to these questions—and the discovery and evidence needed to answer them—will be different due to important factual differences between the types of gambling apps: the game mechanics and payment processing options.

### 1. The Gameplay Differs Between Social Casino Apps and Sweepstakes Casino Apps.

The Panel consolidated the Social Casino cases, in part, because "the nature of the game play" was the same across the "200 or more involved apps." (Apple JPML Dkt. 40 at 1-2.) The nature of game play in the Sweepstakes Casino Apps, however, is fundamentally different. The allegations in the Sweepstakes cases are centered on *redeemable* Sweeps Coins. In contrast, the Social Casino MDL complaints don't involve redeemable coins at all. The Social Casino Apps allow users to purchase and wager Gold Coins for the chance to win more playing time; the Sweepstakes Casino Apps allow users to purchase and wager Sweeps Coins for the chance of winning real money.

This is both factually and legally significant since many states define gambling to involve wagering a "thing of value." *E.g.*, RCWA 9.46.0285 (defining "thing of value" as "any money or property, any token, object or article exchangeable for money or property, or any form of credit

or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."). The *Bargo* plaintiffs' claims will turn on whether redeemable Sweeps Coins are "thing[s] of value"—an issue not raised in the Platform MDLs at all. Conversely, the Platform MDLs will turn on whether non-redeemable Gold Coins are "thing[s] of value." These determinations will ultimately involve different questions of law and fact and different discovery into the game mechanics and user experiences for each type of app.

The Platforms' failure to meaningfully address this difference is fatal to their motions. Google doesn't acknowledge this difference at all, misleadingly implying that the conduct at issue in *Bargo*, like in the MDLs, is the purchasing of "virtual coins to play for the chance *to win more playing time*[.]" (Google Mot. at 7 (emphasis added).) This is false. Apple addresses the difference in a cursory fashion, arguing that transfer is still appropriate because § 1407 does not require "complete identity or even a majority of common factual issues[.]" (Apple Mot. at 13 (quoting *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361, 1363 (J.P.M.L. 2014)).) But this is not merely an "additional" question of fact—the mechanics of the virtual coins offered by the casino apps is central to their illegality.[2] (*See, e.g.*, *Bargo* Compl. ¶ 110 (claiming Sweeps Coins are a "thing[s] of value" under New Jersey gambling laws because "they can be redeemed for cash, gift cards, cryptocurrency and other valuable prizes[]").) Accordingly, the fact that Sweeps Coins operate differently than Gold Coins destroys commonality around the game play issue.

---

[2]    The gameplay differences do, however, raise additional factual questions. For example, the *Bargo* plaintiffs' consumer fraud claim is premised, in part, on the allegation that the Sweepstakes Casino Apps' promise that users can redeem Sweeps Coins for real money is "phony." (*Bargo* Compl. ¶ 52.) Since the Social Casino Apps don't make any such promises, that factual issue is absent from the MDLs.

2.    **The Platforms' Relationship with Sweepstakes Casinos is Fundamentally Different from their Relationship with the Social Casinos that are Part of this MDL.**

The Platforms' relationship with Sweepstakes Casinos differs from their relationship with the Social Casinos in three critical respects: First, several of the Sweepstakes Casinos are not even hosted on the Platforms' app stores, eliminating any basis for Platform promotion or revenue sharing. Second, for those Sweepstakes Casinos that do have mobile apps, the vast majority of virtual coin purchases occur outside the Platforms' proprietary payment systems—in stark contrast to the Social Casino Apps where the Platforms exclusively broker all in-app purchases. Third, it is unclear what, if any, commission the Platforms take on coin purchases made through Apple Pay and Google Pay; whereas the Platforms collect a universal 30% commission on in-app coin purchases.

a.    **Some of the apps at issue in the *Bargo* Complaint are not even hosted on the App Store or Google Play Store.**

The Panel identified the Platforms' "alleged promotion of the apps" as a common question. (*See* Apple JPML Dkt. 40 at 2.) Here, however, the differences in game mechanics have led the Platforms to treat the two categories of gambling apps differently in terms of promotion, advertising, and revenue sharing. Importantly, some of the Sweepstakes Casinos targeted in the *Bargo* Complaint are not even available on the App Store or Google Play Store. Wow Vegas, Scrooge Casino, and Jackpota, for example, do not have iOS or Android mobile applications, meaning that the Platforms don't promote, advertise, or take a 30% cut on purchases made in these casinos.[3] (*See Bargo* Compl. ¶ 5) The Platforms treat the two categories

---

[3]    *See* James Leeland, *Wow Vegas App: Testing Wow Vegas on Mobile*, Deadspin (June 9, 2025), https://deadspin.com/sweepstakes-casinos/reviews/wow-vegas/app/ (noting that Wow Vegas "has yet to launch a native app for Android and iOS users"); James Leeland, *Scrooge Casino Review: How Does Scrooge Compare as a Sweeps Casino?*, Deadspin (June 9, 2025), https://deadspin.com/sweepstakes-casinos/reviews/scrooge/ (noting that Scrooge Casino does not

of apps differently, and so the evidence about promotion activities and revenue sharing will be different.

> **b. For those that are hosted on the App Store and Google Play Store, most virtual coin purchases occur off-app—unlike the Social Casino Apps where the Platforms are the exclusive brokers of coin purchases that all occur on the app.**

The Panel also determined that the Social Casino App cases involved common factual issues regarding "the function of in-app purchases," and the Platforms' "financial arrangements or distributing app-based revenue from the games[.]" (*Id.* at 2.) These commonalities do not extend to the Sweepstakes Casino Apps.

In the Social Casino Apps, the Platforms are the sole brokers of virtual coin purchases in the Social Casino Apps and take a 30% cut of every one of those in-app purchases. (*See Apple* Am. Compl. ¶¶ 76, 95; *Google* Am. Compl. ¶ 92.) That's because users can only purchase virtual coins through "in-app purchases." (*Apple* Am. Compl. ¶ 63 ("Apple operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots."); *Google* Am. Compl. ¶ 61 (similar).) "In-app purchase" is a term of art that refers to a very specific payment process using Apple's "In-App Purchase API" and Google's "In-App Purchases API" linked to the Apple Store and Google Play Store, respectively. *Apple Developer Program License Agreement* § 3.3.9; *Google Play Developer APIs*, *available at* https://perma.cc/AY7V-6WDP.

In the Sweepstakes Casino Apps, by contrast, purchasing does not run primarily (if at all) through the Platforms. The allegations of the *Bargo* plaintiffs are somewhat confused on this

---

"offer an iOS or Android app[]"); Mike McKean, *Jackpota App: How Does Jackpota Casino Compare on Mobile?*, Deadspin (June 9, 2025), https://deadspin.com/sweepstakes-casinos/reviews/jackpota/app/#:~:text=casino%20software%20suppliers-,Pros%20and%20cons%20of%20the%20Jackpota%20app,games%20on%20Jackpota's%20mobile%20site.&text=Access%20to%20over%20700%20games,No%20downloads%20required (noting that "[t]he Jackpota app is only available via browsers").

point, but the complaint acknowledges that users purchase virtual coins through a bevy of methods that don't implicate the Platforms at all (e.g., via credit card or cryptocurrency) or with "Apple Pay" or "Google Pay." (*Bargo* Compl. ¶¶ 16-18, 39.) But Apple Pay and Google Pay are not the in-app, Platform-based purchases that unify this MDL. To be sure, the *Bargo* plaintiffs allege that Google and Apple take up to 30% of all revenues through sales in the "Play Store" and "App Store"—i.e., through in-app purchases. (*Id.* ¶ 60.) But the complaint says nothing about how often in-app purchasing actually occurs in the Sweepstakes Casino Apps, and the allegations tacitly admit that most of that purchasing happens outside of the app via a credit card, Apple Pay, and Google Pay. (*Id.* ¶ 16-18, 39.) That is, when purchasing coins in the Sweepstakes Casino Apps, users are primarily routed out of the application itself.

Because the Platforms are not the exclusive brokers of purchasing in the Sweepstakes Casino Apps, the Sweepstakes Casino Apps in the *Bargo* Action have far different levels of involvement (if any) by the Platforms. Given that this MDL is entirely focused on the Platforms' liability for their considerable involvement with respect to Social Casino apps—all of which is exactly the same across the at-issue applications—the *Bargo* Action does not belong there.

### c. Apple Pay and Google Pay present fundamentally different factual questions than the exclusive in-app purchasing that unifies this MDL.

When it comes to Apple Pay and Google Pay, it is unclear whether the Platforms take *any* commission on purchases made in the Sweepstakes Casino Apps—let alone the universal 30% commission they take on in-app purchases in the Social Casino Apps. The *Bargo* plaintiffs only allege "[u]pon information and belief" that Apple and Google take "a substantial commission" for purchases through Apple Pay and Google Pay. (*Id.* ¶ 65.) In fact, the complicated differences between how Apple treats in-app purchases and those made by other means is the subject of an

ongoing antitrust lawsuit. *See Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2025 WL 1260190, at *9 (N.D. Cal. Apr. 30, 2025). One look at that case reveals the briar of thorny factual issues raised by the different payment processing options at-issue in the *Bargo* Action. As a result, the *Bargo* Action will require additional discovery to untangle these issues, which are not relevant to the MDLs.

Furthermore, some of the Sweepstakes Apps cited in the *Bargo* Complaint don't even permit the use of Apple Pay and Google Pay. High 5, for example, did not permit the use of Apple Pay and Google Pay at least prior to June 6, 2025. *See* James Wright, *High 5 Casino Payment Methods 2025*, Vegas Insider (June 6, 2025), https://www.vegasinsider.com/ sweepstakes-casinos/high-5/payments/; *see also Bargo* Compl. ¶ 39 (displaying screenshot of payment options, which do not include Apple Pay or Google Pay).) Similarly, Stake.us does not permit Apple Pay or Google Pay and, instead, requires users to purchase virtual coins using cryptocurrency. *See Terms & Conditions*, § 7.3(a), Stake.us (last visited June 10, 2025), https://stake.us/policies/terms. For any online-only sweepstakes casinos that don't offer Apple Pay and Google Pay, it is unclear whether or how the *Bargo* plaintiffs allege that the Platforms profit from any virtual coin purchases at all. Establishing which sweepstakes casinos offer Apple Pay and Google Pay and during what time period is yet another complicated factual issue not relevant to the Social Casino MDLs.

### d.  The similarities that the Platforms identify in the pleadings relate to the theory of liability—not the underlying facts.

The Platforms fail to address these key differences, instead offering the Panel charts and long citations comparing allegations in the MDLs with allegations in the *Bargo* Action. (Apple Mot. at 9-12; Google Mot. at 9-10.) But many of the *Bargo* plaintiffs' allegations—which seem to be copied almost verbatim from the MDL Complaints—relate to the broad theory of RICO

liability, not to the underlying facts that will support liability. (*See, e.g.*, Apple Mot. at 11 and Google Mot. at 9 (comparing *Bargo* Compl. ¶ 72 ("The Defendants, for their part, directly participate in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap hundreds of millions of dollars in profits") with *Apple* Am. Compl. ¶ 17 and *Google* Am. Compl. ¶ 17 ("Defendant [Apple / Google], for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits")).) Others actually highlight the factual differences, to which the Platforms turn a blind eye. (*See, e.g.*, Apple Mot. at 10 (comparing *Bargo* Compl. ¶ 65 ("[The Platforms] offer[] consumers the option to pay using proprietary payment processing services owned and operated by Defendants GOOGLE PAYMENT CORP. and APPLE PAYMENTS (Google Pay and Apple Pay, respectively)" with *Apple* Am. Compl. ¶ 63 ("Apple operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots.")).) The fact that the *Bargo* Complaint shares some language does not justify transfer, especially where key underlying facts differ.

## B.      Transfer Would Not Promote the Just and Efficient Resolution of the Actions.

The Platforms' only argument that transfer would promote efficiency and be convenient for the Parties is that, because the cases are factually identical, transfer will prevent duplicative discovery, inconsistent rulings, and will preserve judicial resources. (Apple Mot. at 13-17; Google Mot. at 12-15.) These arguments crumble along with their foundational assumption that the cases are factually identical. Given the significant factual differences, transfer would not serve the ends of judicial efficiency or convenience. *See In re Consol. Parlodel Litig.*, 182 F.R.D. 441, 445 (D.N.J. 1998) (noting that "[t]he desire for judicial efficiency would not be

served[]" by transfer where "unique details of each case would still need to be presented to the jury.").

### 1. Different Discovery Is Needed in Each Case and Informal Coordination can Mitigate the Burden of any Overlap.

The *Bargo* Action will involve different and additional discovery than that needed in the MDLs to prove that Sweepstakes Casino Apps are illegal and to prove whether and to what extent the Platforms are liable. For example, the *Bargo* Action will require discovery into different payment processing systems and different APIs to determine the Platforms' role in the Sweepstakes Casino Apps and the extent to which they profit from the purchase of virtual coins in those apps. To the extent there is overlapping discovery, informal coordination can easily be employed to avoid duplicative discovery, undue burden, and other inefficiencies. Such coordination, to the extent warranted, is far preferable to transfer, which would create many more problems than it would solve.

### 2. There is Little Risk of Inconsistent Pretrial Rulings.

The Platforms' assertion that transfer is appropriate to avoid inconsistent pretrial rulings fares no better. (*See* Apple Mot. at 15-16; Google Mot. at 15.) Apple claims that there is a risk of inconsistent rulings because it "may make the same motion to dismiss arguments in *Bargo* as it has in the MDL." (Apple Mot. at 15.) This is, of course, true at the highest level—Apple will likely argue that it is immune under CDA 230 and that the *Bargo* plaintiffs fail to state a claim under the state loss recovery statutes and RICO. (*Id.*) But that doesn't mean that two adjudications of these arguments will be inconsistent—even if the outcomes differ. Because the underlying facts are different between the *Bargo* Action and these MDLs, it is not concerning to have courts in different forums apply the law to different sets of facts. *See Sequeira v. United States Dep't of Homeland Sec.*, 347 F.R.D. 510, 516 (N.D. Cal. 2024). For example, the

13

Platforms' CDA immunity defense will likely be different in the *Bargo* Action than in these MDLs, given that the Platforms' role and financial stake in virtual coin sales differ for the Sweepstakes Casino Apps. Similarly, the differences in game mechanics may result in different analysis of the underlying illegality of the casino apps.

For the same reasons, the factual differences between the cases also renders moot the Platforms' concern about inconsistent rulings on class certification. (*See* Apple Mot. at 16-17; Google Mot. at 11, 15.) The proposed classes in the MDLs include those "who have lost money *to any Illegal Slots*" through the Platforms. (*Google* Am. Compl. ¶ 131; *Apple* Am. Compl. ¶ 140 (emphasis added).) And "Illegal Slots" are defined as Social Casino Apps like those listed in the MDL complaints where users purchase and wager virtual coins, which cannot be redeemed for real money. (*See Apple* Compl. ¶¶ 15, 78; *Google* Compl. ¶¶ 15, 74.) The *Bargo* proposed classes, by contrast, are limited to those "who have lost money by wagering *in any Sweepstakes Casino*" though the Platforms—i.e., the Sweepstakes Casino Apps where users purchase and wager Sweeps Coins that can be redeemed for real money. (*Bargo* Compl. ¶¶ 91-93 (emphasis added).)

The cases the Platforms cite for support contain very little analysis and, to the extent that they do, are inapposite because the common defenses and legal issues in those cases were amenable to being determined based on common facts and because the class definitions were, in fact, overlapping. *See, e.g.*, *In re: Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 24 F. Supp. 3d 1366, 1367 (J.P.M.L. 2014) (common defenses related to common factual issues regarding the protection of amateurism in college sports and the promotion of competitive balance); *In re: Nebivolol (%2C040) Pat. Litig.*, 867 F. Supp. 2d 1354, 1355 (J.P.M.L. 2012) (common defenses turned on common language in patents across all

cases); *In re Lupron Mktg. & Sales Pracs. Litig.*, 180 F. Supp. 2d 1376, 1377-78 (J.P.M.L. 2001) (stating that centralization would prevent inconsistent rulings on class certification without any analysis); *In re Am. Gen. Life & Accident Ins. Co. Indus. Life Ins. Litig.*, 175 F. Supp. 2d 1380, 1381 (J.P.M.L. 2001) (same); *In re Plumbing Fixtures*, 308 F. Supp. 242 (J.P.M.L. 1970) (class definitions actually overlapped).

### 3.   Transfer Would Merely Shift the Inconvenience from the Defendants to the *Bargo* Plaintiffs.

The Platforms' next contention, that transfer would be more convenient for the Parties and witnesses, carries little weight. (Apple Mot. at 15; Google Mot. at 13, 16.) To be sure, transfer would be more convenient for the Platforms, since they are based in California. (*See Apple* Am. Compl. ¶ 50; *Google* Am. Compl. ¶ 47.) But it would be significantly more inconvenient for the *Bargo* plaintiffs, who reside in New Jersey and New York and who chose New Jersey as their forum. (*Bargo* Compl. ¶¶ 12-14.) Convenience does not weigh in favor of transfer where the "result is merely to shift the inconvenience from one party to another." *Schultz v. Harry S. Truman Scholarship Found.*, No. 20-CV-04058-MMC, 2022 WL 3691663, at *3 (N.D. Cal. Aug. 25, 2022) (analyzing convenience factor in § 1404 transfer context); *CPG Holdings, LLC v. Craig*, No. CV 07-4072 (WHW), 2008 WL 11510684, at *6 (D.N.J. June 2, 2008) (same). Furthermore, the fact that Platform witnesses are located in California, (Apple Mot. at 15; Google Mot. at 13), is given little weight because they are employees of a party. *See Schultz*, 2022 WL 3691663, at *3 ("in balancing the convenience of the witnesses, primary consideration is given to third party, as opposed to employee, witnesses") (cleaned up).

4.    **Transfer Would Procedurally Complicate, Rather than Streamline, All Cases.**

Finally, transfer would delay and procedurally complicate the *Bargo* Action and the Social Casino MDLs. The MDL Court already issued a decision on Section 230 immunity, and the parties in the MDLs already have fully briefed and argued a second round of motions to dismiss the Master Complaints. Those complaints don't even mention Sweeps Coins, let alone advance theories of liability based on them. Injecting *Bargo*'s fundamentally different Sweeps Coin-based claims would set the MDLs back by either requiring the court to restart the entire pleading process with a new Master Complaint, or create a bifurcated proceeding where *Bargo* follows its own separate track.

To complicate matters further, it is unclear how *Bargo* could be consolidated with both the Google MDL *and* the Apple MDL in an efficient manner. The Platforms seem to recognize this dilemma, but don't offer the Panel a workable solution. In a footnote, Google suggests that "Judge Davila could manage coordination of an additional case in the same manner that he has been coordinating the Google MDL, Apple MDL, and Meta Actions." (Google Mot. at 12 n.5.) In essence, Google is asking the Panel to create an entirely separate track for one case. Apple recommends sticking Judge Davila with the procedural decision, indicating that he could either take Google's proposed route or "sever the claims against Apple from the claims against Google and consolidate the severed *Bargo* claims with the respective MDLs." (Apple Mot. at 1 n.1.) This would force the *Bargo* plaintiffs to litigate two cases rather than one and would require new Master Complaints in both MDLs. Rather than achieving the efficiency goals of MDL consolidation, forcing these disparate cases together would create a procedural morass that complicates litigation and delays resolution for all parties involved.

## IV.     CONCLUSION

For the foregoing reasons, the Platforms' motions to transfer should be denied.


Respectfully submitted,


Dated: June 10, 2025                              **EDELSON PC**


By: */s/ Todd Logan*

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silver-Korn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel.: 415.212.9300
Fax: 415.373.9435

*Plaintiffs' Interim Lead Counsel*
*Plaintiffs' Law and Briefing Counsel*

17